UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| PAUL W. ROTH III AND SUSAN C. ROTH, Plaintiff, | ) ) ) ) ) ) ) ) ) ) ) | CIVIL ACTION<br><br>Case No.<br><br>JURY TRIAL DEMANDED |
| v. | | |
| PNC BANK, N.A., | | |
| Defendants. | | |

# COMPLAINT

Plaintiffs, PAUL W. ROTH III AND SUSAN C. ROTH, by the undersigned attorneys, file this complaint against PNC BANK, N.A., as follows:

## NATURE OF THE ACTION

1. Plaintiffs PAUL W. ROTH III AND SUSAN C. ROTH (collectively "Roth") bring this action for damages for Breach of Contract, violations of the Illinois Consumer Fraud Act ("ICFA"), and violations of the Real Estate Settlement Procedures Act ("RESPA").

2. All of the claims stated herein stem from the wrongful servicing and debt collection activities related to Roth's home mortgage loan.

## JURISDICTION AND VENUE

3. Subject matter jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337, and 12 U.S.C. § 2614 as the action arises under the laws of the United States. The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367. Venue is proper in this District pursuant to 28 U.S.C. § 1391 as Roth resides in this District and the events occurred in this District.

1

4. Diversity jurisdiction is conferred upon this Court by 28 U.S.C. § 1332, as the matter in controversy exceeds $75,000.00 and is between citizens of different states.

**PARTIES**

5. Plaintiffs Paul and Susan Roth are natural persons who reside at 1517 Terrance Drive, Naperville, IL 60565 (the "property"). The property is Roth's primary residence.

6. Defendant PNC Bank, N.A. is a banking subsidiary of The PNC Financial Services Group with its principal place of business in Pittsburgh, Pennsylvania. PNC is a foreign corporation in the business of servicing loans across the country, including in the State of Illinois.

7. PNC Bank, N.A. also does business through its mortgage servicer, PNC Mortgage (hereinafter PNC Bank and PNC Mortgage collectively referred to as "PNC").[1]

**INTRODUCTION**

8. Roth entered into a loan modification with PNC in August 2011 to avoid foreclosure.

9. Roth agreed to modify the balance of his mortgage loan with PNC to approximately $300,000.00 as part of a written loan modification contract.

10. Unbeknownst to Roth at the time, PNC unilaterally increased Roth's loan balance to over $400,000.00 as part of the loan modification. PNC hid the increase by labeling it a "second mortgage" in the approximate amount of $100,000.00 in its internal records.

11. PNC never had any written agreement with Roth to increase the loan balance to over $400,000.00 or impose a "second mortgage" on his account in the amount of ~$100,000.00.

---

[1] PNC Bank and PNC Mortgage have a principal/agent relationship. PNC Bank is liable for the acts of its agent and servicer for the subject loan, PNC Mortgage.

12. Roth did not find out about the inflated principal balance or that PNC was representing that he owed them a "second mortgage" until he attempted to refinance and was denied because he reportedly owed PNC over $400,000.00.

13. The result is that PNC stripped all equity in Roth's home without his written authorization or agreement.

14. At the same time, PNC continued to collect monthly payments from Roth by representing in loan statements and payment coupons that Roth only owed ~$300,000.00.

15. Roth made written requests and disputes to PNC to honor the agreed to modified balance of $300,000.00.

16. PNC ignored Roth's disputes and continued to record Roth's loan balance as over $400,000.00.

17. PNC also unfairly reported that Roth owed over $400,000.00 to third parties and credit bureaus.

18. Despite the lack of any written agreement and Roth's requests to correct the loan balance, PNC refuses to modify its accounting or remove any record of a "second mortgage" from his loan account.

19. PNC has stripped the equity from Roth's home in violation of their written agreement.

20. PNC attempted to disguise the loan balance increase its internal record-keeping system by calling it a "second mortgage."

21. Roth was unable to regain the equity in his home without conducting time-consuming investigations into his account and PNC's payment history, and hiring an attorney to force PNC to abide by its obligations under contract and obligations as a servicer of consumer loans.

**FACTS SUPPORTING THE CAUSES OF ACTION**

22. On March 25, 2004, Roth executed a mortgage loan in the amount of $320,000.00 in favor of MidAmerica, that was secured by Roth's home ("subject loan"). *See* Group Exhibit A attached hereto is a true copy of the mortgage and note.

23. Defendant PNC is the successor by merger to the original creditor for the subject loan. The original lender, MidAmerica, FSB merged into National City Bank, which later merged into defendant PNC in 2010.

24. In 2009, Roth fell behind on the monthly payments on the subject loan.

25. As a result, on December 13, 2010, PNC filed a foreclosure action against Roth in the case known as *PNC Bank N.A. v. Paul W. Roth III and Susan C. Roth*, DuPage County, Illinois, Case No. 2010 CH 006999 (the "foreclosure").

26. In an attempt to remedy the default and the foreclosure, Roth applied for a loan modification with PNC.

27. While Roth was applying for a loan modification, PNC agreed to forbear collecting payments on the subject loan.

28. During the time that Roth applied for the loan modification, he missed approximately 12 monthly payments.

29. In July 2011, Roth was approved for a loan modification by PNC.

30. On July 26, 2011 and August 8, 2011, respectively, both Roth and a representative of PNC signed two documents (collectively "loan modification contract") required for the loan modification. The first document was the "Loan Workout Plan." The second document was the "Temporary Loan Payment Modification Agreement." *See* Group Exhibit B attached hereto is a true copy of the loan modification contract.

31. The new modified principal balance on the loan modification contract was $308,834.97, and the interest rate was fixed at 5.375%. *Id.*

32. The loan modification contract required Roth to make three trial period payments of $1,672.04 by August 1, 2011, September 1, 2011, and October 1, 2011, respectively. *Id.*

33. The loan modification contract set forth the following schedule to repay the modification balance of $308,834.97 by the year 2034:

   a) 3 trial period payments of $1,672.04;

   b) 33 payments of $1,672.04;

   c) 237 payments of $1,791.90; and

   d) one balloon payment of $104,528.59 at maturity. *Id.*

34. Roth paid all three trial period payments required by the loan modification contract on time and in full to PNC, at which time the trial modification converted into a permanent modification. *Id.*

35. After the loan modification, the foreclosure was dismissed on October 31, 2011.

36. Roth's account was brought current by the loan modification and he made all payments on the loan modification contract.

37. Roth has made all monthly payments in a timely fashion on the loan modification from August 1, 2011 through today. Roth has never fallen behind on his loan modification payments.

38. Additionally, each month's payment coupon sent by PNC to Roth during this time period stated that Roth owed a principal balance on his loan of approximately $300,000.00 (adjusted slightly each month to account for the ongoing payments).

39. Due to Roth's creditworthiness, and the equity in the subject property (the modified loan balance was a little over $300,000.00 and his home was worth over $400,000.00) in the fall of

2013, PNC solicited Roth to refinance the subject mortgage loan at a lower interest rate. *See* Exhibit C attached hereto is a true copy of the refinance commitment letter.

40. On November 12, 2013, PNC approved Roth for a refinance loan with the following terms:

    a)     Loan Amount: $304,600.00;

    b)     Fixed Interest Rate: 4.625%;

    c)     Monthly Payment: $1,5667.07; and

    d)     Term 30 years. *Id.*

41. Right before the refinance was scheduled to close, Roth received a phone call from a representative of PNC stating that the refinance was canceled. PNC stated that the refinance was canceled because the total balance on the loan was not ~$300,000.00, but instead over $400,000.00.

42. Roth was confused that the purported loan balance was more than $400,000.00. That amount was approximately $104,000.00 more than the actual modified balance in his loan modification contract. *See* Exhibit B.

43. A PNC loan representative advised Roth to send a letter requesting his account history or disputing the principal balance.

44. On December 16, 2013, Roth sent his first RESPA Qualified Written Request ("QWR") to PNC disputing the inflated balance. *See* Exhibit D attached hereto is a true copy of the December 16, 2013 QWR.

45. After Roth sent his first QWR, on December 31, 2013, Roth received a regular mortgage statement providing that his principal loan balance was $299,915.36. *See* Exhibit E attached hereto is a true copy of the December 31, 2013 statement.

46. On January 2, 2014, PNC sent a letter to Roth acknowledging receipt of his first QWR, and promising to research his dispute. *See* Exhibit F attached hereto is a true copy of the QWR acknowledgement letter.

47. On January 9, 2014, PNC responded to Roth's first QWR without providing any written explanation or conducting any investigation. PNC merely attached documents to its response, and stated:

> *After researching the loan... here is what we found:*
>
> *We have included a copy of the payment history and included a payment history transaction code. Also are copies of the Modification documents you signed in July 2011.*
>
> *See* Exhibit G attached hereto is a true copy of PNC's QWR response letter with payment history attached.

48. The payment history provided with PNC's QWR response letter stated that as of January 2014, Roth had a first mortgage loan in the amount of $297,583.52, a ***second mortgage* in the amount of $104,528.59, and owed a total loan balance of $402,112.11 ($297,583.52 + $104,528.59)**. *Id. See also* Exhibit H attached hereto is a true copy of the relevant page of the payment history.

49. As Roth feared, this amount was well over the actual modified principal balance of approximately $300,000.00. *Id.*

50. However, the payment history claimed or incorrectly stated that Roth owed not only a loan balance of approximately $300,000.00 to PNC, but also a second mortgage to PNC of $104,528.69. *Id.*

51. There is no recorded or documented second mortgage on the property in favor of PNC in the amount of $104,528.69. Instead, PNC increased Roth's loan balance by over $104,000.00, and called it a "second mortgage" in an attempt to hide the loan increase.

7

52. Due to the clear errors in PNC's payment history and accounting, on February 10, 2014, Roth sent a second QWR to PNC disputing the inflated balance and pointing to the specific time in the payment history when the balance increased by $104,000.00. *See* Exhibit I attached hereto is a true copy of the February 10, 2014 second QWR.

53. Roth's second QWR stated:

> *Thank you for the information provided and the supporting letter dated 2014 January 09. Unfortunately the information provided is not sufficient to explain adjustments to my account.*
>
> *From the detail provided the following items were identified from page 68137 of the PNC Bank, National Association Loan History Y-T-D Inv N55 Cat 001 INV# 0001005507 T13:*

| Due Date | Proc Date | TP TR | SQ NO | Atm. Rec'd | Princ. Paid | Princ. Bal. |
|---|---|---|---|---|---|---|
| 5-10 | 11-25 | 1  43 | 1 | .00 | 19221.20- | 308834.97 |
| 8-11 | 12-09 | 1  43 | 1 | .00 | 104528.59- | 413363.56 |
| Total | | | | | 123749.80- | |

> *As previously requested I am looking for detailed information supporting how the above two transactions were determined and who was responsible for calculating the amounts. Id.*

54. Despite Roth's detailed information request, PNC did not respond at all to Roth's second QWR.

55. In April 2015, Roth conducted a further investigation and reviewed his online account on PNC's website. The breakdown of Roth's loan contained the same incorrect calculations that Roth had disputed.

56. According to PNC's online account information, as of April 2015, Roth owed:

   a) A current principal balance of $293,377.97;

   b) His loan is scheduled to mature in April 2034; and

   c) And he owed a "second mortgage" with PNC in the amount of $104,528.00.

*See* Exhibit J attached hereto is a true copy of Roth's Current Loan Information.

8

57. In April 2015, Roth also looked up his "amortization schedule" on PNC's website. *See* Exhibit K attached hereto is a true copy of the amortization schedule.

58. The amortization schedule also mirrored the terms of the payment history that Roth had disputed. *Id.*

59. According to PNC's amortization schedule, Roth owes a balance of ~$300,000.00, a balloon payment of ~$104,000.00, and a "second mortgage" of $104,000.00. *Id.*

60. The amortization schedule also demonstrates that Roth owes over $400,000.00 on the subject loan, as opposed to the ~$300,000.00 that he actually owes.

61. The amortization schedule is the fourth document produced by PNC to show that Roth's loan balance is over $400,000.00, as opposed to under the $300,000.00 that he agreed to.

62. Finally, PNC even reported this improper balance increase to the credit bureaus.

63. According to Roth's most recent credit reports, PNC reported an unpaid balance on the subject loan of ~$400,000.00 as opposed to the less than $300,000.00 that Roth actually owes. *See* Group Exhibit L attached hereto as relevant pages from Roth's Experian, Trans Union, and Equifax credit reports.

64. Either due to a grave accounting error, gross servicing negligence, or a deliberate attempt to deceive Roth, he now owes a grossly increased principal balance that has stripped all equity[2] from his property through a second mortgage that he never agreed to in the amount of $104,528.59. *Id.*

65. Roth has continued to make his mortgage payment for the amounts set forth in his statement and mortgage coupons throughout the date of this complaint. All of Roth's mortgage statement and coupons continue to reflect a principal loan balance of ~$300,000.00. Roth has

---

[2] According to zillow.com the property is currently worth approximately $465,608.00. ZILLOW, www.zillow.com (last visited May 26, 2015).

never received a statement for a second mortgage payment or showing a loan balance of over $400,000.00.

66. None of the documentation for a second mortgage and corresponding increased principal balance was available or disclosed to Roth at the time that he entered into the loan modification.

67. The documentation showing the second mortgage and corresponding increased principal balance was not provided to Roth until he conducted an investigation on his own, reviewed additional information in his online account that was not provided to him in the mail, and made written requests for information.

68. What is perhaps most unfortunate, despite Roth's two written requests, PNC has refused to fix, remedy, or investigate the addition of over $104,000.00 to Roth's agreed to modified loan balance through the imposition of a second mortgage on Roth's account without permission, notice, or disclosure.

69. Roth has suffered damages as a result. He has not only lost all equity in his home, but also the ability to refinance into a considerably lower interest rate.

70. Roth's marriage and job performance have also suffered. Unable to understand the loss of the refinance, he and his wife have had heated arguments over the propriety of PNC's accounting. More so, having negotiated the loan modification himself, Roth felt as if he had failed his family and ultimately sacrificed his home.

71. After Roth was unable to fix the problem on his own, Roth was forced to hire attorneys to review his loan, review the loan's amortization, review his file, and file the instant lawsuit to force PNC to fix its wrongful accounting and loan modification practices.

## COUNT I – BREACH OF CONTRACT

72. Roth repeats and realleges paragraphs 1 through 71 as though fully set forth herein.

73. Roth has a valid and enforceable mortgage contract with PNC as the servicer of the subject loan.

74. Roth entered into a binding loan modification contract for the subject loan with an agreed to modified principal balance of $308,834.97. *See* Exhibit B.

75. Roth fully performed his duties under the contract by tendering all monthly payments and by complying with all other terms of the subject loan and loan modification contract.

76. Roth has made every payment and complied with all terms as modified by the loan modification contract.

77. PNC arbitrarily, and without notice or right under contract, inflated the balance by over $104,000.00 by imposing a second mortgage that Roth never agreed to orally or in writing.

78. PNC breached the loan modification contract by increasing Roth's principal balance by over $104,000.00.

79. PNC sought to collect over $104,000.00 from Roth in violation of the subject loan modification contract by a) increasing his loan balance without authorization, notice, or disclosure, b) representing that Roth owed a second mortgage in the amount of $104,000.00, when no second mortgage existed on the property, and c) reporting to credit bureaus that the balance on the subject loan was ~$400,000.00, instead of the less than ~$300,000.00 that he actually owed.

80. PNC sent conflicting statements and payment coupons in violation of the loan modification contract; these statements and payment coupons conflicted directly with the information in PNC's internal and online accounting records for Roth's loan.

81. PNC failed to properly account for the actual terms of the loan modification contract.

82. Roth requested that PNC correct the improper loan balance, but his request was refused.

83. PNC failed to acknowledge Roth's request and correct his account in accordance with the loan modification contract.

84. Roth lost the opportunity to refinance his loan for a better interest rate due to PNC's unilateral undisclosed increase to the loan balance.

85. PNC is in further material breach of contract for its:

    i. failure to credit and apply Roth's payments as required by the contract;
    ii. assessment of unauthorized fees and costs;
    iii. failure to provide accurate account information;
    iv. failure to provide disclosures;
    v. failure to accurately respond to Roth's correspondence and other disputes; and
    vi. failure to conduct its affairs in good faith.

86. Roth suffered damages as a result of PNC's breach of contract.

87. Roth lost equity in the property. The property was stripped of over $104,000.00 in equity.

88. Roth has suffered a loss of time, money, and forced to hire an attorney to respond to PNC's breach of contract.

89. PNC's breach of contract has placed a tremendous strain on Roth. The Roths have had heated arguments that have led to great distress in their marriage due to PNC's breach of contract and refusal to correct its breach.

WHEREFORE, Plaintiff PAUL W. ROTH III AND SUSAN C. ROTH respectfully request that this Honorable Court:

    a. find that PNC materially breached the mortgage contract;
    b. award Roth their actual damages to be proven at trial;
    c. award Roth their reasonable attorney's fees and costs; and
    d. award Roth any other relief this Honorable Court deems equitable and just.

### COUNT II – VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT

90. Roth repeats and realleges paragraphs 1 through 89 as though fully set forth herein.

91. The subject loan is a "federally related mortgage" under RESPA. *See* Exhibit A.

92. PNC qualifies as a "servicer" under RESPA § 2605(i)(2).

    a. **Violation of § 2605(e)(1)**

93. If a servicer receives a QWR from a borrower, section 2605(e)(1) of RESPA requires the servicer to provide the borrower a written response acknowledging receipt of any QWR within 5 business days.

94. With respect to the second QWR sent by Roth to PNC on February 10, 2014, PNC did not respond in any fashion and never acknowledged receipt of the QWR.

95. PNC violated RESPA § 2605(e)(1) when it failed to acknowledge receipt of Roth's second QWR.

    b. **Violation of § 2605(e)(2)**

96. Section 2605(e)(2) of RESPA requires the servicer, within 30 days of receipt of a QWR, to either (i) make corrections to the borrower's account and provide the borrower written notification of the corrections; or (ii) conduct an investigation and provide the borrower a written explanation as to the disputed issues including why the servicer believes its servicing is correct; or (iii) conduct an investigation and provide the borrower a written explanation as to why the requested information is not available.

97. With respect to the first QWR sent by Roth to PNC on December 16, 2013, PNC did not respond to Roth's dispute in one of the three ways allowed under § 2605(e)(2).

98. Additionally, any written response <u>must</u> include the name and telephone number of a representative of the servicer who can provide assistance to the borrower.

99. If a servicer does not respond in writing in one of the three possible methods in paragraph 96 above <u>and</u> provide the borrower with the name and telephone number or a representative who can provide assistance, the servicer is in violation of section 2605(e)(2) of RESPA.

100. PNC failed to properly respond to Roth's two QWRs, correct Roth's account, conduct a reasonable investigation of the account, or provide an explanation writing as required by RESPA.

101. With respect to the first QWR sent by Roth to PNC on December 16, 2013, PNC's written response did not comply with one of the three methods authorized by RESPA. Additionally, PNC's written response did not provide Roth with a name and phone number of a PNC representative who could provide Roth with assistance.

102. With respect to the second QWR sent by Roth to PNC on February 10, 2014, PNC did not acknowledge receipt, respond in any fashion, or provide Roth with a name and phone number of a PNC representative.

103. PNC failed to respond to Roth's QWRs as required by RESPA and is therefore in violation of section 2605(e)(2).

WHEREFORE, Plaintiffs PAUL W. ROTH III AND SUSAN C. ROTH request that this Honorable Court:

    a. grant judgment in Roth's favor and against PNC;
    b. declare PNC's perpetual conduct to be a violation of RESPA;
    c. award Roth actual and additional damages pursuant to RESPA § 2605(f);
    d. award Roth reasonable attorney's fees and costs pursuant to RESPA § 2605(f); and
    e. award any other relief this Honorable Court deems equitable and just.

## COUNT III – VIOLATION OF ILLINOIS CONSUMER FRAUD ACT

104. Roth repeats and realleges paragraphs 1 through 103 as though fully set forth herein.

105. Roth meets the ICFA definition of "consumer" and the definition of "person" under ICFA. *See* 810 ILCS 505/1 et seq.

106. PNC violated 815 ILCS 505/2 by engaging in unfair and deceptive acts, and by using fraud, deception, and misrepresentation in its attempts to collect a debt.

   a. **Unfairness**

107. It was unfair for PNC to increase Roth's principal loan balance without permission, and send statements to Roth that conflicted with its own internal records and actual intent to collect over $400,000.00 from Roth and the property.

108. It was unfair for PNC to represent to Roth through the loan modification contract and monthly statements that the amount secured by the mortgage was ~$300,000.00, while it recorded in its internal records and reported to credit bureaus and third parties an inflated balance of over $400,000.00.

109. Roth's inquiries and disputes regarding the servicing of his loan were never investigated nor adequately answered; the lack of clarity from PNC resulted in an unsophisticated consumer entering into a perpetual state of confusion regarding the true status of the mortgage loan and the principal balance owed.

110. PNC's conduct in relation to Roth's loan was willful, malicious, unfair, arbitrary, and designed to strip the equity from Roth's home without consent.

111. PNC's conduct offends public policy as it demonstrates an industry-wide practice of increasing the loan balance secured by property without notice or disclosure in order to make a profit.

112. PNC's actions caused substantial injury to Roth and to consumers generally, as Roth and consumers reasonably expect their contracts to be honored, their loans and accounts to be properly managed, and their principal balance accurately stated.

113. Roth could not avoid these immoral undertakings because PNC sent conflicting correspondence, failed to make material disclosures, and would not accurately communicate with Roth in response to his phone calls, letters, other objections, and requests for information.

114. When taken as a whole, PNC' conduct was so unethical and unending, that Roth had no choice but to submit in order to keep his family home.

115. To this day Roth has had no choice but to submit to the loan increase and second mortgage loan.

116. Roth would not have agreed to the terms of the subject loan modification had he known that it would result in a second mortgage and loan balance that stripped nearly all of the equity from the property.

      **b. Deception**

117. PNC's following actions were deceptive: (i) PNC secretly increased Roth's principal balance by adding a second mortgage without permission; (ii) PNC failed to make proper disclosures so that Roth could make a meaningful decision to enter into the loan modification; (iii) made material misrepresentations of fact regarding the status of the subject loan, the payment history, and the amounts actually owed; (iv) overcharged Roth's account an amount not authorized by the contract or law; (v) employed communications with Roth that were confusing and specifically designed to deceive Roth so he could not decipher the true statements from the deceptive statements; and (vi) reported an inflated mortgage loan balance to credit bureaus and third parties.

118. In addition to the above conduct, PNC misrepresented the amounts due so Roth could not understand why his loan balance increased by over $104,000.00.

119. Roth relied upon the amounts that PNC stated that he owed in his loan modification contract and mortgage loan statements to his detriment.

120. Roth relied upon the terms of the subject loan, by paying the amounts he that he owed, only to be tricked into an increased balance on the loan.

121. PNC intended Roth to rely on its deceptive and unfair acts and its misrepresentations, and Roth did in fact rely on PNC's deceptive and unfair acts to his detriment.

122. Roth entered into the loan modification contract with PNC, and made his monthly payments based on the principal balance stated in his loan modification contract, which was not the principal balance that PNC's account records reflected.

123. Roth also applied for a refinance based on what he understood to be the balance on the subject loan as reflected in his loan modification contract and monthly statements, only to be rejected and told he actually owed much more and was ineligible for a refinance.

124. The misrepresentations, deception, and unfair practices complained of occurred in the course of conduct involving trade or commerce.

125. Punitive damages are warranted because PNC's conduct was outrageous, willful, wanton, showed reckless disregard for the rights of Roth and consumers in general. Additionally, this conduct is part of a pattern and practice of behavior in which PNC routinely engages as part of his business model. It is PNC's normal business practice to falsely characterize its arrangements with consumers, and obligations under state and federal law, then misstate to consumers the nature of outstanding "debts" and amounts "owed" for its own pecuniary gain.

WHEREFORE, Plaintiffs PAUL W. ROTH III AND SUSAN C. ROTH request that this Honorable Court:

    a. enter judgment in Roth's favor and against PNC;

    b. declare that the practices complained of herein are unlawful and violate the aforementioned statutes and regulations;

    c. award Roth actual and punitive damages, in an amount to be determined at trial, for the underlying ICFA violations;

    d. order the correction of the credit reporting related to the loan;

    e. award Roth costs and reasonable attorney fees under 815 ILCS 505/10a(c); and

    f. award any other relief as this Honorable Court deems just and appropriate.

**Plaintiff demands trial by jury.**

        Respectfully Submitted,

        By: ___/s/Mara A. Baltabols____
            **Mara A. Baltabols**
            Attorney for Plaintiff

Sulaiman Law Group, Ltd.
Mara A. Baltabols
ARDC # 6299033
Mohammed O. Badwan
ARDC # 6299011
900 Jorie Blvd., Suite 150
Oak Brook, IL 60523
(630) 575-8181