## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| PAUL W. ROTH III AND SUSAN C. ROTH,<br><br>      Plaintiffs,<br><br>v.<br><br>PNC BANK, N.A.<br><br>      Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Case No. 15 cv 04779<br><br>The Honorable Amy J. St. Eve |

## PNC'S ANSWER AND NOTICE OF AFFIRMATIVE AND OTHER DEFENSES TO PLAINTIFFS' COMPLAINT

Defendant PNC Bank, National Association ("PNC"), through its attorneys Clark Hill PLC, submits the following for its Answer and Notice of Affirmative and Other Defenses to Plaintiffs' Complaint:

## PRELIMINARY STATEMENT

A.     Unless expressly admitted, each factual allegation is denied as untrue.

B.     The complete document referred to, quoted, or paraphrased is the best evidence of the contents thereof and must be considered in its entirety.

## ANSWER

### Nature of the Action

1.     Plaintiffs Paul W. Roth and Susan C. Roth (collectively "Roth") bring this action for damages for Breach of Contract, violations of the Illinois Consumer Fraud Act ("ICFA"), and violations of the Real Estate Settlement Procedures Act ("RESPA").

**ANSWER:**    PNC denies as untrue that Plaintiffs are entitled to the relief sought and, in further response, denies as untrue that PNC is liable to Plaintiffs in any amount or under any theory.

1

2.      All of the claims stated herein stem from the wrongful servicing and debt collection activities related to Roth's home mortgage loan.

**ANSWER:**   PNC denies as untrue that it engaged in "wrongful servicing and debt collection activities."

**Jurisdiction and Venue**

3.      Subject matter jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331 and 1337, and 12 U.S.C. § 2614 as the action arises under the laws of the United Stated. The Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367. Venue is proper in this District pursuant to 28 U.S.C. § 1391 as Roth resides in this District and the events occurred in this District.

**ANSWER:**   This paragraph reflects a series of legal conclusions, to which no response is required.

4.      Diversity jurisdiction is conferred upon this Court by 28 U.S.C. § 1332, as the matter in controversy exceeds $75,000.00 and is between citizens of different states.

**ANSWER:**   This paragraph reflects a legal conclusion, to which no response is required.

**Parties**

5.      Plaintiffs Paul and Susan Roth are natural persons who reside at 1517 Terrance Drive, Naperville, IL  60565 (the "property"). The property is Roth's primary residence.

**ANSWER:**   PNC lacks knowledge or information sufficient to form a belief as to the allegation, which has the effect of a denial.

6.      Defendant PNC Bank, N.A. is a banking subsidiary of the PNC Financial Service Group with its principal place of business in Pittsburg, Pennsylvania. PNC is a foreign corporation in the business of servicing loans across the country, including in the State of Illinois.

**ANSWER:**   PNC denies as untrue that it is a "foreign corporation" and states that it is a national banking association. PNC admits the remaining allegations in this paragraph.

7.      PNC Bank, N.A. also does business through its mortgage servicer, PNC Mortgage (hereinafter PNC Bank and PNC Mortgage collectively referred to as "PNC").

2

Footnote 1:     PNC Bank and PNC Mortgage have a principal/agent relationship.  PNC Bank is liable for the acts of its agent and servicer for the subject loan, PNC Mortgage.

**ANSWER:**     PNC denies as untrue that PNC Mortgage is its "mortgage servicer" and that PNC and PNC Mortgage have a "principal/agent relationship" and states that PNC Mortgage is a division of PNC.  The remainder of this paragraph reflects a legal conclusion, to which no response is required.

### Introduction

8.     Roth entered into a loan modification with PNC in August 2011 to avoid foreclosure.

**ANSWER:**     PNC admits only that PNC entered into a loan modification agreement with Plaintiffs in August 2011.  PNC lacks knowledge or information sufficient to form a belief as to Plaintiffs' motivations for entering into the loan modification agreement, which has the effect of a denial.

9.     Roth agreed to modify the balance of his mortgage loan with PNC to approximately $300,000.00 as part of a written loan modification contract.

**ANSWER:**     PNC admits only that, pursuant to the parties' loan modification agreement, Plaintiffs' principal loan balance was $308,834.97.

10.     Unbeknownst to Roth at the time, PNC unilaterally increased Roth's loan balance to over $400,000.00 as part of the loan modification.  PNC hid the increase by labeling it's a "second mortgage" in the approximate amount of $100,000.00 in its internal records.

**ANSWER:**     Denied as untrue.

11.     PNC never had any written agreement with Roth to increase the loan balance to over $400,000.00 or impose a "second mortgage" on his account in the amount of ~$100,000.00.

**ANSWER:**     Admitted.

12.     Roth did not find out about the inflated principal balance or that PNC was representing that he owed them a "second mortgage" until he attempted to refinance and was denied because he reportedly owed PNC over $400,000.00.

3

**ANSWER:** PNC denies as untrue that it "inflated" Plaintiffs' principal loan balance or represented that they owed a "second mortgage." PNC lacks knowledge or information sufficient to form a belief as to what or when Plaintiffs "found out," which has the effect of a denial.

13. The result is that PNC stripped all equity in Roth's home without his written authorization or agreement.

**ANSWER:** Denied as untrue.

14. At the same time, PNC continued to collect monthly payments from Roth by representing in loan statements and payment coupons that Roth only owed ~$300,000.00.

**ANSWER:** PNC admits that Plaintiffs' loan statements and payment coupons accurately reflected Plaintiffs' loan balance.

15. Roth made written requests and disputes to PNC to honor the agreed to modified balance of $300,000.00.

**ANSWER:** PNC lacks knowledge or information sufficient to form a belief as to the allegation, which has the effect of a denial, as Plaintiffs fail to identify the specific "written requests and disputes" to which this allegation refers.

16. PNC ignored Roth's disputes and continued to record Roth's loan balance as over $400,000.00.

**ANSWER:** PNC denies as untrue that it "ignored" any disputes properly submitted by and received from Plaintiffs or "recorded" Plaintiffs' loan balance as over $400,000.00.

17. PNC also unfairly reported that Roth owed over $400,000.00 to third parties and credit bureaus.

**ANSWER:** Denied as worded and, therefore, denied as untrue.

18. Despite the lack of any written agreement and Roth's requests to correct the loan balance, PNC refuses to modify its accounting or remove any record of a "second mortgage" from his loan account.

4

**ANSWER:**   PNC denies as untrue that it does not have "any written agreement" with Plaintiffs, that it refused to correct Plaintiffs' loan balance, or that it has made a "record of a 'second mortgage'" on Plaintiffs' "loan account."   PNC lacks knowledge or information sufficient to form a belief as to the remainder of this paragraph, which has the effect of a denial, as Plaintiffs fail to identity the "requests" and "accounting" to which this paragraph refers.

19.     PNC has stripped the equity from Roth's home in violation of their written agreement.

**ANSWER:**   Denied as untrue.

20.     PNC attempted to disguise the loan balance increase its internal record-keeping system by calling it a "second mortgage."

**ANSWER:**   Denied as untrue.

21.     Roth was unable to regain the equity in his home without conducting time-consuming investigations into his account and PNC's payment history, and hiring an attorney to force PNC to abide by its obligations under contract and obligations as a servicer of consumer loans.

**ANSWER:**   Denied as untrue.

### Facts Supporting the Causes of Action

22.     On March 25, 2004, Roth executed a mortgage loan in the amount of $320,000.00 in favor of MidAmerica, that was secured by Roth's home ("subject loan").   See Group Exhibit A attached hereto is a true copy of the mortgage and note.

**ANSWER:**   PNC admits only that on, March 25, 2004, Plaintiffs executed a promissory note, promising to repay a loan in the principal amount of $320,000 and granted a mortgage to MidAmerica Bank, FSB on certain real property to secure repayment of the loan.

23.     Defendant PNC is the successor by merger to the original creditor for the subject loan.   The original lender, MidAmerica, FSB, merged into National City Bank, which later merged into defendant PNC in 2010.

5

**ANSWER:** PNC denies as untrue that National City Bank merged into PNC in 2010 and states that National City Bank merged with PNC in November 2009. PNC admits the remaining allegations in this paragraph.

24. In 2009, Roth fell behind on the monthly payments on the subject loan.

**ANSWER:** PNC admits that Plaintiffs defaulted in March 2010.

25. As a result, on December 13, 2010, PNC filed a foreclosure action against Roth in the case known as PNC Bank, N.A. v. Paul W. Roth III and Susan C. Roth, Du Page County, Illinois, Case No. 2010 CH 006999 (the "foreclosure").

**ANSWER:** Admitted.

26. In an attempt to remedy the default and the foreclosure, Roth applied for a loan modification with PNC.

**ANSWER:** PNC admits that Plaintiffs applied for a loan modification. PNC lacks knowledge or information sufficient to form a belief as to Plaintiffs' motivations for applying for a loan modification, which has the effect of a denial.

27. While Roth was applying for a loan modification, PNC agreed to forbear collecting payments on the subject loan.

**ANSWER:** PNC denies as untrue that it entered into an agreement "to forbear collecting payments on the subject loan."

28. During the time that Roth applied for the loan modification, he missed approximately 12 monthly payments.

**ANSWER:** Admitted.

29. In July 2011, Roth was approved for a loan modification by PNC.

**ANSWER:** PNC admits only that in July 2011, PNC approved Plaintiffs for a temporary payment trial plan.

30. On July 26, 2011 and August 8, 2011, both Roth and a representative of PNC signed two documents (collectively "loan modification contract") required for the loan modification. The first document was the "Loan Workout Plan." The second document was the

6

"Temporary Loan Payment Modification Agreement."  See Group Exhibit B attached hereto is a true copy of the loan modification contract.

> **ANSWER:**  Admitted.

31.  The new modified principal balance on the loan modification contract was $308,834.97, and the interest rate was fixed at 5.375%. *Id.*

> **ANSWER:**  Admitted.

32.  The loan modification contract required Roth to make three trial period payments of $1,672.04 by August 1, 2011, September 1, 2011, and October 1, 2011, respectively. *Id.*

> **ANSWER:**  PNC admits only that the Temporary Loan Payment Modification Agreement required Plaintiffs to make three trial period principal and interest payments of $1,672.04 by August 1, 2011, September 1, 2011, and October 1, 2011, respectively.

33.  The loan modification contract set forth the following schedule to repay the modification balance of $308,834.97 by the year 2034:
   a)   3 trial period payment of $1,672.04;
   b)   33 payments of $1,672.04;
   c)   237 payments of $1,791.90; and
   d)   one balloon payment of $104,528.59 at maturity. *Id.*

> **ANSWER:**  PNC admits only that the Temporary Loan Payment Modification Agreement required principal and interest payments as set forth in this paragraph.

34.   Roth paid all three trial period payments required by the loan modification contract on time and in full to PNC, at which time the trial modification converted into a permanent modification.

> **ANSWER:**  PNC admits only that Plaintiffs timely made the trial period payments required under the Temporary Loan Payment Modification Agreement.  The remainder of this paragraph reflects Plaintiffs' characterization of the Temporary Loan Payment Modification Agreement, to which no response is required.  To the extent a response is required, PNC states that the Temporary Loan Payment Modification Agreement speaks for itself and is the best evidence of its contents.

203501494.1 19865/186672

35.     After the loan modification, the foreclosure was dismissed on October 31, 2011.

**ANSWER:**   PNC admits that the foreclosure was dismissed.  At this time, PNC lacks

knowledge or information sufficient to form a belief as to the date on which the foreclosure was

dismissed.

36.     Roth's account was brought current by the loan modification and he made all
payments on the loan modification contract.

**ANSWER:**   This paragraph reflects Plaintiff's characterization of the Temporary Loan

Payment Modification Agreement, to which no response is required.  To the extent a response is

required, PNC states that the Temporary Loan Payment Modification Agreement speaks for itself

and is the best evidence of its contents.

37.     Roth has made all monthly payments in a timely fashion on the loan modification
from August 1, 2011 through today.  Roth has never fallen behind on his loan modification
payments.

**ANSWER:**   PNC admits only that Plaintiffs have timely made all monthly mortgage

payments due under the Temporary Loan Payment Modification Agreement to-date.

38.     Additionally, each month's payment coupon sent by PNC to Roth during this time
period stated that Roth owed a principal balance on his loan of approximately $300,000.00
(adjusted slightly each month to account for the ongoing payments).

**ANSWER:**   Admitted.

39.     Due to Roth's creditworthiness, and the equity in the subject property (the
modified loan balance was a little over $300,000.00 and his home was worth over $400,000.00)
in the fall of 2013, PNC solicited Roth to refinance the subject mortgage loan at a lower interest
rate.  See Exhibit C attached hereto is a true copy of the refinance commitment letter.

**ANSWER:**   Denied as worded and, therefore, denied as untrue.

40.     On November 12, 2013, PNC approved Roth for a refinance loan with the
following terms:
(a) Loan Amount: $304,600.00;
(b) Fixed Interest Rate: 4.625%
(c) Monthly Payment: $1,5667.07
(d) Term 30 years.  Id.

8

**ANSWER:**     Denied as untrue.

41.     Right before the refinance was scheduled to close, Roth received a phone call from a representative of PNC stating that the refinance was canceled.  PNC stated that the refinance was canceled because the total balance on the loan was not ~$300,000.00, but instead over $400,000.00.

**ANSWER:**     Because Plaintiffs have not identified the specific representative of PNC to whom this allegation refers, PNC currently lacks knowledge or information sufficient to form a belief as to the allegation, which has the effect of a denial.

42.     Roth was confused that the purported loan balance was more than $400,000.00. That amount was approximately $104,000.00 more than the actual modified balance in his loan modification contract.  See Exhibit B.

**ANSWER:**     PNC denies as untrue that the subject loan balance was "more than $400,000.00."  PNC lacks knowledge or information sufficient to form a belief as to the mental state of Plaintiffs, which has the effect of a denial.

43.     A PNC loan representative advised Roth to send a letter requesting his account history or disputing the principal balance.

**ANSWER:**     Because Plaintiffs have not identified the specific PNC loan representative to whom this allegation refers, PNC currently lacks knowledge or information sufficient to form a belief as to the allegation, which has the effect of a denial.

44.     On December 16, 2013, Roth sent his first RESPA Qualified Written Request ("QWR") to PNC disputing the inflated balance.  See Exhibit D attached hereto is a true copy of the December 16, 2013 QWR.

**ANSWER:**     Denied as untrue.

45.     After Roth sent his first QWR, on December 31, 2013, Roth received a regular mortgage statement providing that his principal loan balance was $299,915.36.  See Exhibit E attached hereto is a true copy of the December 31, 2013 statement.

**ANSWER:**     PNC denies as untrue that Plaintiffs sent PNC a QWR.  PNC admits the remainder of this paragraph.

9

46.     On January 2, 2014, PNC sent a letter to Roth acknowledging receipt of his first QWR, and promising to research his dispute. See Exhibit F attached hereto is a true copy of the QWR acknowledgment letter.

**ANSWER:**     PNC denies as untrue that the letter attached as Exhibit F to Plaintiffs' Complaint acknowledges receipt of a QWR and, in further response, denies as untrue that PNC received a QWR from Plaintiffs. PNC admits only that it sent the letter to Plaintiffs on January 2, 2014. Responding further, PNC states that this paragraph reflects Plaintiffs' characterization of the letter, to which no response is required. To the extent a response is required, PNC states that the letter speaks for itself and is the best evidence of its contents.

47.     On January 9, 2014, PNC responded to Roth's first QWR without providing any written explanation or conducting any investigation. PNC merely attached documents to its response, and stated:

> *After researching the loan ... here is what we found:*
>
> *We have included a copy of the payment history and included a payment history transaction code. Also are copied of the Modification documents you signed in July 2011.*

See Exhibit G attached hereto is a true copy of PNC's QWR response letter with payment history attached.

**ANSWER:**     PNC denies as untrue that Plaintiffs sent or that PNC received from Plaintiffs a QWR. PNC further denies as untrue that the letter attached to Plaintiff's Complaint as Exhibit G is a "QWR response letter." In further response, PNC denies as untrue that it sent the subject letter on January 9, 2014, that it did not conduct an investigation before sending the letter to Plaintiffs, and that the letter does not provide a written explanation. This remainder of this paragraph reflects Plaintiffs' incorrect characterization and quotation of the letter, to which no response is required. To the extent a response is required, PNC states that the letter is the best evidence of its contents.

48.     The payment history provided with PNC's QWR response letter stated that as of January 2014, Roth had a first mortgage loan in the amount of $297,583.52, a second mortgage

10

in the amount of $104,528.59, and owed a total loan balance of $402,112.11 ($297,583.52 + $104,528.59). *Id.* See also Exhibit H attached hereto is a true copy of the relevant page of the payment history.

    **ANSWER:**   Denied as untrue.

    49.    As Roth feared, this amount was well over the actual modified principal balance of approximately $300,000.00. *Id.*

    **ANSWER:**   PNC lacks knowledge or information sufficient to form a belief as to what Plaintiffs "feared," which has the effect of a denial. PNC admits only that, at all times relevant to this action, the loan balance was approximately $300,000.00. PNC lacks knowledge or information sufficient to form a belief as to the remainder of this paragraph, which has the effect of a denial, as Plaintiffs fail to identify the specific quantitative term to which "this amount" refers.

    50.    However, the payment history claimed or incorrectly stated that Roth owed not only a loan balance of approximately $300,000.00 to PNC, but also a second mortgage to PNC of $104,528.69. *Id.*

    **ANSWER:**   This paragraph reflects Plaintiff's incorrect characterization of the documentation attached to Plaintiff's Complaint as Exhibit G, to which no response is required. To the extent a response is required, PNC states that the documentation speaks for itself and is the best evidence of its contents.

    51.    There is no recorded or documented second mortgage on the property in favor of PNC in the amount of $104,528.69. Instead, PNC increased Roth's loan balance by over $104,000.00, and called it a "second mortgage" in an attempt to hide the loan increase.

    **ANSWER:**   PNC admits only that there is no second mortgage on the subject property in favor of PNC. PNC denies the remainder of this paragraph as untrue.

    52.    Due to the clear errors in PNC's payment history and accounting, on February 10, 2014, Roth sent a second QWR to PNC disputing the inflated balance and pointing to the specific time in the payment history when the balance increased by over $104,000.00. See Exhibit I attached hereto is a true copy of the February 10, 2014 second QWR.

**ANSWER:**     Denied as untrue.

53.     Roth's second QWR stated:

*Thank you for the information provided and the supporting letter dated 2014 January 09. Unfortunately the information provided is not sufficient to explain adjustments to my account.*

*From the detail provided the following items were identified from page 68137 of the PNC Bank, National Association Loan History Y-T-D Inv N55 Cat 001 INV# 0001005507 T13:*

[TABLE]

*As previously requested I am looking for detailed information supporting how the above two transactions were determined and who was responsible for calculating the amounts. Id.*

**ANSWER:**     PNC denies as untrue that Plaintiffs sent or that PNC received from Plaintiffs a QWR.  The remainder of this paragraph reflects Plaintiffs' characterization of the letter attached to Plaintiffs' Complaint as Exhibit I, to which no response is required.  To the extent a response is required, PNC states that the letter is the best evidence of its contents.

54.     Despite Roth's detailed information request, PNC did not respond at all to Roth's second QWR.

**ANSWER:**     PNC denies as untrue that Plaintiffs sent or that PNC received from Plaintiffs a QWR.

55.     In April 2015, Roth conducted a further investigation and reviewed his online account on PNC's website.  The breakdown of Roth's loan contained the same incorrect calculations that Roth had disputed.

**ANSWER:**     PNC lacks knowledge or information sufficient to form a belief as to what Plaintiff reviewed in April 2015, which has the effect of a denial.

56.     According to PNC's online account information, as of April 2015, Roth owed:
       (a) A current principal balance of $293,377.97;
       (b) His loan is scheduled to mature in April 2034; and
       (c) And he owed a "second mortgage" with PNC in the amount of $104,528.00.
       See Exhibit J attached hereto is a true copy of Roth's Current Loan Information.

**ANSWER:**     Denied as untrue.

12

57.     In April 2015, Roth also looked up his "amortization schedule" on PNC's website.  See Exhibit K attached hereto is a true copy of the amortization schedule.

**ANSWER:**     PNC lacks knowledge or information sufficient to form a belief as to what Plaintiffs "looked up," which has the effect of a denial.  In further response, PNC denies as untrue that the document attached to Plaintiffs' Complaint as Exhibit K is a amortization schedule printed from PNC's website.

58.     The amortization schedule also mirrored the terms of the payment history that Roth had disputed. *Id.*

**ANSWER:**     PNC lacks knowledge or information sufficient to form a belief as to the allegation, which has the effect of a denial, as Plaintiffs fails to identify the "payment history" to which this allegation refers.

59.     According to PNC's amortization schedule, Roth owes a balance of ~$300,000.00, a balloon payment of ~$104,000.00, and a "second mortgage" of $104,000.00. *Id.*

**ANSWER:**     Denied as untrue.

60.     The amortization schedule also demonstrates that Roth owes over $400,000.00 on the subject loan, as opposed to the ~$300,000.00 that he actually owes.

**ANSWER:**     Denied as untrue.

61.     The amortization schedule is the fourth document produced by PNC to show that Roth's loan balance is over $400,000.00, as opposed to under the $300,000.00 that he agreed to.

**ANSWER:**     Denied as untrue.

62.     Finally, PNC even reported this improper balance increase to the credit bureaus.

**ANSWER:**     PNC denies as untrue that it reported a "balance increase" to the credit bureaus.

63.     According to Roth's most recent credit reports, PNC reported an unpaid balance on the subject loan of ~$400,000.00 as opposed to the less than $300,000.00 that Roth actually owes.  See Group Exhibit L attached hereto as relevant pages from Roth's Experian, Trans Union, and Equifax credit reports.

203501494.1 19865/186672

**ANSWER:**    At this time, PNC lacks knowledge or information sufficient to form a

belief as to the allegation, which has the effect of a denial.

64.    Either due to a grave accounting error, gross servicing negligence, or a deliberate
attempt to deceive Roth, he now owes a grossly increased principal balance that has stripped all
equity from his property through a second mortgage that he never agreed to in the amount of
$104,528.59. *Id.*

Footnote 2: According to Zillow.com the property is currently worth approximately
$465,608.00. Zillow, www.zillow.com (last visited May 26, 2015).

**ANSWER:**    PNC lacks knowledge or information sufficient to form a belief as to

information reflected on May 26, 2015 at www.zillow.com, which has the effect of a denial.

PNC denies the remainder of this paragraph as untrue.

65.    Roth has continued to make his mortgage payment for the amounts set forth in his
statement and mortgage coupons throughout the date of his complaint. All of Roth's mortgage
statement and coupons continue to reflect a principal loan balance of ~$300,000.00. Roth has
never received a statement for a second mortgage payment or showing a loan balance of over
$400,000.00.

**ANSWER:**    Admitted.

66.    None of the documentation for a second mortgage and corresponding increased
principal balance was available or disclosed to Roth at the time that he entered into the loan
modification.

**ANSWER:**    PNC denies as untrue that there is any "second mortgage" held by PNC on

the property or that PNC increased the principal loan balance.

67.    The documentation showing the second mortgage and corresponding increased
principal balance was not provided to Roth until he conducted an investigation on his own,
reviewed additional information in his online account that was not provided to him in the mail,
and made written requests for information.

**ANSWER:**    PNC denies as untrue that there is any "second mortgage" held by PNC on

the property or that PNC increased the principal loan balance.

68.    What is perhaps most unfortunate, despite Roth's two written requests, PNC has
refused to fix, remedy, or investigate the addition of over $104,000.00 to Roth's agreed to

modified loan balance through the imposition of a second mortgage on Roth's account without permission, notice, or disclosure.

**ANSWER:** PNC denies as untrue that there is any "second mortgage" held by PNC on the property or that PNC increased the principal loan balance.

69. Roth has suffered damages as a result. He has not only lost all equity in his home, but also the ability to refinance into a considerably lower interest rate.

**ANSWER:** Denied as untrue.

70. Roth's marriage and job performance have also suffered. Unable to understand the loss of the refinance, he and his wife have heated arguments over the propriety of PNC's accounting. More so, having negotiated the loan modification himself, Roth felt as if he had failed his family and ultimately sacrificed his home.

**ANSWER:** PNC lacks knowledge or information sufficient to form a belief as to Plaintiffs' marital discontent or job performance, or Plaintiff Paul Roth's personal feeling that he has "failed his family," which has the effect of a denial.

71. After Roth was unable to fix the problem on his own, Roth was forced to hire attorneys to review his loan, review the loan's amortization, review his file, and file the instant lawsuit to force PNC to fix its wrongful accounting and loan modification practices.

**ANSWER:** Denied as untrue.

### Count I – Breach of Contract

72. Roth repeats and realleges paragraphs 1 through 71 as though fully set forth herein.

**ANSWER:** PNC incorporates its previous responses by reference.

73. Roth has a valid and enforceable mortgage contract with PNC as the servicer of the subject loan.

**ANSWER:** PNC denies as untrue that it is the servicer for the subject loan. PNC admits only that its holds a valid and enforceable mortgage interest in the subject property and that the Temporary Loan Payment Modification Agreement is a valid and enforceable agreement.

15

74.     Roth entered into a binding loan modification contract for the subject loan with an agreed to modified principal balance of $308,834.97.  See Exhibit B.

**ANSWER:**   PNC admits only that it entered into the Temporary Loan Payment Modification Agreement with Plaintiffs and that, pursuant to that agreement, Plaintiffs' principal loan balance was $308,834.97.

75.     Roth fully performed his duties under the contract by tendering all monthly payments and by complying with all other terms of the subject loan and loan modification contract.

**ANSWER:**   PNC denies as untrue that Plaintiffs have tendered all monthly payments and complied with all other terms of the parties' agreements.

76.     Roth has made every payment and complied with all terms as modified by the loan modification contract.

**ANSWER:**   At this time, PNC lacks knowledge or information sufficient to form a belief as to the allegation that Plaintiffs have complied with all terms of the Temporary Loan Payment Modification Agreement, which has the effect of a denial.

77.     PNC arbitrarily, and without notice or right under contract, inflated the balance by over $104,000.00 by imposing a second mortgage that Roth never agreed to orally or in writing.

**ANSWER:**   Denied as untrue.

78.     PNC breached the loan modification contract by increasing Roth's principal balance by over $104,000.00.

**ANSWER:**   Denied as untrue.

79.     PNC sought to collect over $104,000.00 from Roth in violation of the subject loan modification contract by (a) increasing his loan balance without authorization, notice, or disclosure, (b) representing that Roth owed a second mortgage in the amount of $104,000.00, when no second mortgage existed on the property, and (c) reporting to credit bureaus that the balance on the subject loan was ~$400,000.00, instead of the less than ~$300,000.00 that he actually owed.

**ANSWER:**   Denied as untrue.

16

80.     PNC sent conflicting statements and payment coupons in violation of the loan modification contract; these statements and payment coupons conflicted directly with the information in PNC's internal and online accounting records for Roth's loan.

**ANSWER:**     Denied as untrue.

81.     PNC failed to properly account for the actual terms of the loan modification contract.

**ANSWER:**     Denied as untrue.

82.     Roth requested that PNC correct the improper loan balance, but his request was refused.

**ANSWER:**     PNC denies as untrue that there existed an "improper loan balance." PNC lacks knowledge or information sufficient to form a belief as to the remainder of this paragraph, which has the effect of a denial, as Plaintiffs fails to identify the specific "request" to which this paragraph refers.

83.     PNC failed to acknowledge Roth's request and correct his account in accordance with the loan modification contract.

**ANSWER:**     PNC denies as untrue that there existed any error to "correct" in Plaintiffs' account. PNC lacks knowledge or information sufficient to form a belief as to the remainder of this paragraph, which has the effect of a denial, as Plaintiffs fails to identify the specific "request" to which this paragraph refers.

84.     Roth lost the opportunity to refinance his loan for a better interest rate due to PNC's unilateral undisclosed increase to the loan balance.

**ANSWER:**     Denied as untrue.

85.     PNC is in further material breach of the contract for its:

    i.   failure to credit and apply Roth's payments as required by the contract;
    ii.  assessment of unauthorized fees and costs;
    iii. failure to provide accurate account information;
    iv.  failure to provide disclosures;
    v.   failure to accurately respond to Roth's correspondence and other disputes; and
    vi.  failure to conduct its affairs in good faith.

17

**ANSWER:**     Denied as untrue.

86.     Roth suffered damages as a result of PNC's breach of contract.

**ANSWER:**     Denied as untrue.

87.     Roth lost equity in the property.  The property was stripped over $104,000.00 in equity.

**ANSWER:**     Denied as untrue.

88.     Roth has suffered a loss of time, money, and forced to hire an attorney to respond to PNC's breach of contract.

**ANSWER:**     Denied as untrue.

89.     PNC's breach of contract has placed a tremendous strain on Roth.  The Roths have had heated arguments that have led to great distress in their marriage due to PNC's breach of contract and refusal to correct its breach.

**ANSWER:**     Denied as untrue.

### Count II – Violation of the Real Estate Settlement Procedures Act

90.     Roth repeats and realleges paragraphs 1 through 90 as though fully set forth herein.

**ANSWER:**     PNC incorporates its previous responses by reference.

91.     The subject loan is a "federally related mortgage" under RESPA.  See Exhibit A.

**ANSWER:**     This paragraph reflects a legal conclusion, to which no response is required.

92.     PNC qualifies as a "servicer" under RESPA § 2605(i)(2).

ANSWER:     This paragraph reflects a legal conclusion, to which no response is required.

### a.     Violation of § 2605(e)(1)

93.     If a servicer received a QWR from a borrower, section 2604(e)(1) of RESPA requires the servicer to provide the borrower a written response acknowledging receipt of any QWR within 5 business days.

18

**ANSWER:** This paragraph reflects Plaintiff's characterization of the statute, to which no response is required.

94. With respect to the second QWR sent by Roth to PNC on February 10, 2014, PNC did not respond in any fashion and never acknowledged receipt of the QWR.

**ANSWER:** PNC denies as untrue that Plaintiffs sent PNC a QWR. In further response, PNC denies as untrue that it engaged in any wrongdoing or is otherwise liable to Plaintiffs.

95. PNC violated RESPA § 2605(e)(1) when it failed to acknowledge receipt of Roth's second QWR.

**ANSWER:** Denied as untrue. Responding further, PNC denies as untrue that Plaintiffs sent PNC a QWR.

**b.    Violation of § 2605(e)(2)**

96. Section 2605(e)(2) of RESPA requires the servicer, within 30 days of receipt of a QWR, to either (i) make corrections to the borrower's account and provide the borrower written notification of corrections; or (ii) conduct an investigation and provide the borrower a written explanation as to the disputed issues including why the servicer believes its servicing is correct; or (iii) conduct an investigation and provide the borrower a written explanation as to why the requested information is not available.

**ANSWER:** This paragraph reflects Plaintiffs' characterization of the statute, to which no response is required.

97. With respect to the first QWR sent by Roth to PNC on December 16, 2013, PNC did not respond to Roth's dispute in one of the three ways allowed under § 2605(e)(2).

**ANSWER:** PNC denies as untrue that Plaintiffs sent PNC a QWR. In further response, PNC denies as untrue that it engaged in any wrongdoing or is otherwise liable to Plaintiffs.

98. Additionally, any written response must include the name and telephone number of a representative of the servicer who can provide assistance to the borrower.

19

**ANSWER:** This paragraph reflects Plaintiffs' characterization of RESPA, to which no response is required.

99. If a servicer does not respond in writing in one of the three possible methods in paragraph 96 above and provide the borrower with the name and telephone number or a representative who can provide assistance, the servicer is in violation of section 2605(e)(2) of RESPA.

**ANSWER:** This paragraph reflects Plaintiffs' characterization of the statute, to which no response is required.

100. PNC failed to properly respond to Roth's two QWRs, correct Roth's account, conduct a reasonable investigation of the account, or provide an explanation in writing as required by RESPA.

**ANSWER:** PNC denies as untrue that Plaintiffs sent or that PNC received from Plaintiffs a QWR. In further response, PNC denies as untrue that it engaged in any wrongdoing or is otherwise liable to Plaintiffs.

101. With respect to the first QWR sent by Roth to PNC on December 16, 2013, PNC's written response did not comply with one of the three methods authorized by RESPA.

**ANSWER:** PNC denies as untrue that Plaintiffs sent or that PNC received from Plaintiffs a QWR. In further response, PNC denies as untrue that it engaged in any wrongdoing or is otherwise liable to Plaintiffs.

102. With respect to the second QWR sent by Roth to PNC on February 10, 2014, PNC did not acknowledge receipt, respond in any fashion, or provide Roth with a name and phone number of a PNC representative.

**ANSWER:** PNC denies as untrue that Plaintiffs sent or that PNC received from Plaintiffs a QWR. In further response, PNC denies as untrue that it engaged in any wrongdoing or is otherwise liable to Plaintiffs.

103. PNC failed to respond to Roth's QWRs as required by RESPA and is therefore in violation of section 2605(e)(2).

**ANSWER:** Denied as untrue. In further response, PNC denies as untrue that Plaintiffs sent or that PNC received from Plaintiffs a QWR.

### Count III – Violation of the Illinois Consumer Fraud Act

104. Roth repeats and realleges paragraphs 1 through 103 as though fully set forth herein.

**ANSWER:** PNC incorporates its previous responses by reference

105. Roth meets the ICFA definition of "consumer" and the definition of "person" under ICFA. See 810 ILCS 505/1 et seq.

**ANSWER:** This paragraph reflects a legal conclusion, to which no response is required.

106. PNC violated 815 ILCS 505/2 by engaging in unfair and deceptive acts, and by using fraud, deception, and misrepresentation in its attempts to collect a debt.

**ANSWER:** Denied as untrue.

**a. Unfairness**

107. It was unfair for PNC to increase Roth's principal loan balance without permission, and send statements to Roth that conflicted with its own internal records and actual intent to collect over $400,000.00 from Roth and the property.

**ANSWER:** PNC denies as untrue that it increased Plaintiffs' principal loan balance, sent statements to Plaintiffs that conflicted with PNC's internal records, or that PNC intended to collect over $400,000.00 from Plaintiffs. In further response, PNC denies as untrue that it engaged in any wrongdoing or is otherwise liable to Plaintiffs.

108. It was unfair for PNC to represent to Roth through the loan modification contract and monthly statements that the amount secured by the mortgage was ~$300,000.00, while it recorded in its internal records and reported to credit bureaus and third parties an inflated balance of over $400,000.00.

**ANSWER:** Denied as untrue. In further response, PNC denies as untrue that it engaged in any wrongdoing or is otherwise liable to Plaintiffs.

21

109.    Roth's inquiries and disputes regarding the servicing of his loan were never investigated nor adequately answered; the lack of clarity from PNC resulted in an unsophisticated consumer entering into a perpetual state of confusion regarding the true status of the mortgage loan and the principal loan balance.

**ANSWER:**    Denied as untrue.

110.    PNC's conduct in relation to Roth's loan was willful, malicious, unfair, arbitrary, and designed to strip the equity from Roth's home without consent.

**ANSWER:**    Denied as untrue.

111.    PNC's conduct offends public policy as it demonstrates an industry-wide practice of increasing the loan balance secured by property without notice or disclosure in order to make a profit.

**ANSWER:**    Denied as untrue.

112.    PNC's actions caused substantial injury to Roth and to consumers generally, as Roth and consumers reasonably expect their contracts to be honored, their loans and accounts to be properly managed, and their principal balance accurately stated.

**ANSWER:**    Denied as untrue.

113.    Roth could not avoid these immoral undertakings because PNC sent conflicting correspondence, failed to make material disclosures, and would not accurately communicate with Roth in response to his phone calls, letters, other objections, and requests for information.

**ANSWER:**    PNC denies as untrue.

114.    When taken as a whole, PNC' conduct was so unethical and unending, that Roth had no choice but to submit in order to keep his family home.

**ANSWER:**    Denied as untrue.    In further response, PNC denies as untrue that it engaged in any wrongdoing or is otherwise liable to Plaintiffs.

115.    To this day, Roth has had no choice but to submit to the loan increase and second mortgage loan.

**ANSWER:**    PNC denies as untrue that it increased Plaintiffs' loan balance or imposed a second mortgage loan.

22

116.    Roth would not have agreed to the terms of the subject loan modification had he known that it would result in a second mortgage and loan balance that stripped nearly all of the equity from the property.

**ANSWER:**    PNC lacks knowledge or information sufficient to form a belief as to Plaintiffs' motivations, which has the effect of a denial.  In further response, PNC denies as untrue that it increased Plaintiffs' loan balance or imposed a second mortgage.  PNC further denies as untrue that it engaged in any wrongdoing or is otherwise liable to Plaintiffs.

**d.    Deception**

117.    PNC's following actions were deceptive: (i) PNC secretly increased Roth's principal balance by adding a second mortgage without permission; (ii) PNC failed to make proper disclosure so that Roth could make a meaningful decision to enter into the loan modification; (iii) made material misrepresentations of fact regarding the status of the subject loan, the payment history, and the amounts actually owed; (iv) overcharged Roth's account an amount not authorized by contract or law; (v) employed communications with Roth that were confusing and specifically designed to deceive Roth so he could not decipher the true statements from the deceptive statements; and (vi) reported an inflated mortgage loan balance to credit bureaus and third parties.

**ANSWER:**    Denied as untrue.  In further response, PNC further denies as untrue that it engaged in any wrongdoing or is otherwise liable to Plaintiffs.

118.    In addition to the above conduct, PNC misrepresented the amounts due so Roth could not understand why his loan balance increased by over $104,000.00.

**ANSWER:**    Denied as untrue.

119.    Roth relied upon the amounts that PNC stated that he owed in his loan modification contract and mortgage loan statements to his detriment.

**ANSWER:**    Denied as untrue.

120.    Roth relied upon the terms of the subject loan, by paying the amounts he that he owed, only to be tricked into an increased balance on the loan.

**ANSWER:**    Denied as untrue.

121.    PNC intended Roth to reply on its deceptive and unfair acts and its misrepresentations, and Roth did in fact rely on PNC's deceptive and unfair acts to his detriment.

23

**ANSWER:**     Denied as untrue.

122.     Roth entered into the loan modification contract with PNC, and made his monthly payments based on the principal balance stated in his loan modification contract, which was not the principal balance that PNC's account records reflected.

**ANSWER:**     Denied as untrue.

123.     Roth also applied for a refinance based on what he understood to be the balance on the subject loan as reflected in his loan modification contract and monthly statements, only to be rejected and told he actually owed much more and was ineligible for a refinance.

**ANSWER:**     At this time, PNC lacks knowledge or information sufficient to form a belief as to the allegation, which has the effect of a denial.  Responding further, PNC denies as untrue that it engaged in any wrongdoing or is otherwise liable to Plaintiffs.

124.     The misrepresentations, deception, and unfair practices complained of occurred in the course of conduct involving trade or commerce.

**ANSWER:**     PNC denies as untrue that it engaged in any misrepresentations, deception, or unfair practices.

125.     Punitive damages are warranted because PNC's conduct was outrageous, willful, wanton, showed reckless disregard for the rights of Roth and consumers in general. Additionally, this conduct is part of a pattern and practice of behavior in which PNC routinely engages as part of his business model.  It is PNC's normal business practice to falsely characterize its arrangements with consumers, and obligations under state and federal law, then misstate to consumers the nature of outstanding "debts" and amounts "owed" for its own pecuniary gain.

**ANSWER:**     Denied as untrue.

WHEREFORE, PNC respectfully requests that the Court dismiss Plaintiffs' Complaint with prejudice.

24

## NOTICE OF AFFIRMATIVE AND OTHER DEFENSES

1.      Plaintiffs' Complaint fails to state a claim upon which relief can be granted.

2.      Plaintiffs' claim for violation of the Real Estate Settlement Procedures Act fails as a matter of law because Plaintiffs did not send PNC a qualified written request to PNC's designated address for the receipt of qualified written requests.

3.      Plaintiffs' claims are barred by the applicable statute of frauds.

4.      Plaintiffs' claim for violation of the Illinois Consumer Fraud Act is barred by 815 ILCS 505/10b.

5.      Plaintiffs' claims are barred because Plaintiffs did not suffer any actual damages. 815 ILCS 505/10b.

6.      PNC reserves the right to amend and/or supplement this notice of affirmative and other defenses.

Respectfully submitted,

**PNC BANK, N.A.**

By:___ /s/Katie N. Simpson-Jones_____
                One of its Attorneys

Katie Simpson-Jones
ARDC: 6307017
CLARK HILL PLC
150 N. Michigan, Suite 2700
Chicago, IL 60601
Telephone No.: (312) 985-5900
Facsimile No.: (312) 985-5999

25